[Civ. No. 27707. First Dist., Div. Two. Jan. 19, 1971.]

BEVERLY L. BRIGGS et al., Plaintiffs and Respondents, v.
THE STATE OF CALIFORNIA et al., Defendants and Appellants;
AETNA CASUALTY AND SURETY COMPANY,
Intervener and Respondent.

## COUNSEL

Harry S. Fenton, John P. Horgan, Robert J. DeFea, Paul O. Lamphere, William R. Edgar and Robert R. Buell for Defendants and Appellants.

Collins, Hays, Stewart, Sanford, Berg & Pott, Inc., and Thomas D. Collins for Plaintiffs and Respondents.

Berry, Davis & McInerney and Arnold B. Haims for Intervener and Respondent.

## OPINION

**TAYLOR, J.**—The state appeals from a judgment and certain orders[1] entered after a jury verdict awarding $365,000 damages for wrongful death to the widow[2] and children (hereafter collectively referred to as Briggs), and Aetna Casualty and Surety Company (hereafter Aetna), the workmen's compensation carrier[3] for the employer of Charles R. Briggs, who was killed in a head-on collision after swerving into the oncoming traffic on a two-lane highway to avoid a mud slide that blocked his lane. The major contentions on appeal are the sufficiency of the evidence as to the state's constructive notice of the dangerous condition on the highway and the

---

[1] The notice of appeal indicates that the state appeals from: 1) the judgment on the verdict; 2) the order denying its motion for judgment notwithstanding the verdict; 3) the order of May 1, 1969, denying its motion for reduction of the award and granting judgment to Aetna; and 4) that portion of the judgment allowing Aetna to recover amounts paid on its workmen's compensation policy.

[2] The widow filed the action individually and as guardian ad litem for the minor children.

[3] As the decedent was in the course and scope of his employment at the time of the accident, there are no issues as to the state's liability to Aetna for the $21,000 of workmen's compensation benefits paid.

propriety of the court's instructions on contributory negligence as a question of fact and the state's duty with respect to adjacent property.

Viewing the record most favorably toward the judgment, as we must, the following pertinent facts appear. The accident occurred on Route 21, a two-lane north and south state highway in Alameda County, between 5:30 and 6 a.m. on Tuesday, January 31, 1967. At that time a light rain was falling and it was dark. The decedent was driving his 1963 Peugeot sedan south on the two-lane highway when he swerved into the northbound lane in order to avoid a large mud slide on the west side of his lane that blocked his lane of traffic. About 65 feet past the center of the slide, the decedent's car smashed into a Chevrolet in the northbound lane, driven by Richard D. Blanchard. Blanchard saw the Peugeot coming toward him and tried to apply his brakes and get out of the way; Blanchard was driving about 45 miles per hour and estimated that the decedent was traveling somewhat faster.

The slide the decedent was trying to avoid came down from the bank above the west side of the southbound lane in a horseshoe shape that extended to the center of the highway. Its dimensions after the accident were estimated from 8 to 20 feet in width, 3 inches to 1 foot deep at the center line, tapering from 1 to 4 feet at the west edge of the roadway and from 6 inches to 4 feet deep in the center of the southbound lane. Most of the mud in the slide came from private property above the state-owned embankment on the west side of the highway, slid down the bank and onto the highway. The slippage occurred from the bottom side of the fence. Slippages in the hill above the fence line were visible and the mud on the hill was cracking up and breaking away. Some of the fence posts were hanging in the air by their wires, and a part of the fence was down. Another portion of the fence had been laid flat by the mud slide.

From about 10 days before January 31, 1967, up to and including the evening before the accident, the State Division of Highways periodically removed mud from the pavement in the area of the slide. The highway crew was at the scene until about 7 o'clock on the evening before the accident and indicated that prior to leaving the scene, they placed signs and pot torches at both ends of the slide to bracket the area and warn on-coming traffic. However, the pot torch in front of the sign in the southbound lane was not burning at 7 o'clock on the evening of January 30, 1967. Even when lighted, the sign, because of its size and mounting, was of poor visibility.

After the accident, a 24-inch yellow wood sign with 4-inch-high letters "Slide Ahead" controlling the southbound traffic was still in place about 320 feet north of the slide site; a 30-inch by 30-inch reflecting sign with

5-inch-high letters "Slide Ahead" sign was still in place about 320 feet south of the slide side in the northbound lane. The state's maintenance manual required that signs be placed 400 feet in advance of the obstruction and specified "reflecting signs," 30 by 30 inches with 5-inch-high letters. These "Slide Ahead" warning signs were observed by several of the regular users of the highway at the site of the accident for a period of 10 days to two to three weeks before the accident. The sign in the southbound lane was not very visible, and could not be read by the driver of a car traveling between 45 and 55 miles per hour.

Sometime between 2:30 and 4 a.m. on January 31, two Alameda County Deputy Sheriffs, Baker and Hussey, passed the scene on a regular patrol. Baker later recalled that he saw a slide that reached to the edge of the pavement in the area and had reported it over the radio, but no notation was made in the log. Baker also noticed that the sign that was up was too close and improperly marked, "a dangerous situation." Hussey was not surprised when he got to the scene of the accident as he was aware that the slide was there.

James Durham, who traveled the area about four times a week in both directions, stated that prior to the accident, the amount of mud on the roadway had been in the same place and about the same amount for 10 days before the accident. Every time, he would have to swerve out into the northbound lane to avoid the mud, as did the other drivers who regularly passed by the slide area. He also stopped to wait for oncoming traffic that had moved into his lane to avoid the mud. Durham passed the area about 7-7:30 p.m. on the evening before the accident and saw the same amount of mud, about one-half to a whole car length long from north to south, and about 8 to 12 inches deep, starting from the west side of the southbound lane tapering down to 2 to 3 inches in the center of the lane. Durham saw no change in the condition on the highway or evidence of a clean-up when he passed the area between 6:30-8 p.m. The mud was consistently there every time he drove by and he "knew something was going to happen there, the condition of that highway."

Roland Wing, in January 1967, lived one-half mile south of the accident site and traveled Route 21 daily on his way to and from college. During the two weeks preceding the accident, he saw mud on the pavement at least seven times or more. Several times before the accident, mud had slid down and filled up the drainage ditch. The mud washed across the pavement about every other day and on two or three occasions had come across the southbound lane into the northbound one. The mud slide was 10-15 feet long from north to south. Wing had observed other slides of mud in the area before the accident and noticed that the state highway crew repeatedly

graded in the ditch at the side. When it rained again, the mud slid a little more and the drainage ditch overflowed again. Water was running across the road at all times. On at least one occasion before the accident, he stopped to allow the passing of a southbound car that had swerved into the northbound lane to avoid the mud. When Wing drove by about 4:30 p.m. the afternoon before the accident, there was 2 to 3 feet of mud about 4 inches thick on the travelway of the southbound lane. About a week before the accident, a slide engulfed and surrounded the warning sign in the southbound lane. Occasionally, the sign was lit by a battery-operated flasher, but often no light was flashing.

Five days before the accident, the decedent had been stopped by a highway patrol officer and told to fix his windshield wipers and that his tires were wearing thin. At that time, the wipers worked briefly when tapped and the decedent told the officer it would take about three weeks to get the parts needed to put the wipers in good order. After the accident, the officer, making the routine inventory, noticed that the windshield wiper on the passenger side of the vehicle was missing. However, the windshield wiper on the driver's side was working properly. An expert witness testified that the lack of the windshield wiper on the passenger side did not impede the vision of the decedent for the type of night driving in the country that he was doing at the time of the collision.

▇▇▇ The first question on appeal is whether the evidence presents an exception to the defense of sovereign immunity. The state argues that the trial court erred in denying its motions for nonsuit and judgment notwithstanding the verdict as there was no evidence that it had actual or constructive notice of the slide on the highway. Section 815 of the Government Code provides that except as otherwise specified by statute, a public entity is immune from liability. Government Code section 835 provides, so far as here pertinent, that in order to charge a public entity with liability for injuries caused by a dangerous condition of public property, the plaintiff must prove, in addition to proximate cause and foreseeability of the risk, that the dangerous condition was created by the public entity or that the public entity "had actual or constructive notice of the dangerous condition . . . sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

As here there was no suggestion that the state caused the large landslide that constituted the dangerous condition, Briggs had the burden of proving that the state had actual or constructive notice. ▇▇▇ Constructive notice within the meaning of Government Code section 835.2 arises "only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of

due care, should have discovered the condition and its dangerous character." Constructive notice may be imputed if it can be shown that an obvious danger existed for a sufficient period of time before the accident to have permitted state employees, in the exercise of due care, to discover and remedy the situation (*State of California* v. *Superior Court,* 263 Cal. App.2d 396, 400 [69 Cal.Rptr. 683]).

 Here, for a period of 10 days to two weeks before the accident, the state highway crew cleaned up the mud caused by the slide in the accident area and put up the signs warning of a "Slide Ahead." During the entire period of time, the ground in the area under the fence above the state-owned embankment was cracking up and breaking away. A part of the fence was down flat and some of the fence posts were hanging in the air by their wires. This condition, coupled with the repeated slides and overflowing of the ditch, and the large amounts of mud and water on the travelway of the southbound lane that drivers regularly circumvented by crossing into the northbound lane, were sufficient indication of turbulence in the accident area, that given the normal rainfall at that time of year, an unusually large slide, such as the one that apparently occurred a few hours before the accident, was readily and reasonably foreseeable. The state acknowledged the dangerous condition by bracketing the site with signs at least 10 days before the accident and leaving the signs out to warn the traveling public.

For the state to argue here that the recurrent condition of the slides and mud could not render the highway dangerous to those drivers using it at the time ignores the plain implications of *Teilhet* v. *County of Santa Clara,* 149 Cal.App.2d 305 [308 P.2d 356], and *Bauman* v. *San Francisco,* 42 Cal.App.2d 144, 153 [108 P.2d 989]. In *Teilhet,* the county annually burned weeds along the highway and smoke crossed the road. The plaintiff, after entering the smoke, hit an automobile traveling in the opposite direction. We held, in comparing the situation in *Teilhet* with that in *Bauman,* that the recurring condition of the prevailing winds blowing the smoke across the highway was a dangerous condition, stating at pages 308 and 309: "The reasonably foreseeable occasional batting or throwing of a ball over or into the sand box, as a result of the known activity of hard baseball being played in its vicinity, was the basic fact which rendered the condition of the sand box 'dangerous' in the *Bauman* case. The reasonably foreseeable intermittent obscuring of the vision of motorists using the highway by smoke from the burning grass and weeds was the basic fact which rendered the highway dangerous in the case before us. On principle we cannot distinguish the one from the other, nor from the other cases above cited in all of which a customary activity in the use of the property was held sufficient to render the property 'dangerous.' "

Similarly here, as in *Teilhet* and *Bauman, supra,* as well as in *Branzel* v. *City of Concord,* 247 Cal.App.2d 68 [55 Cal.Rptr. 167], and *Chavez* v. *County of Merced,* 229 Cal.App.2d 387 [40 Cal.Rptr. 334], whether the given set of facts or circumstances creates a dangerous condition was a question of fact for the determination of the jury. Here, as in *Branzel,* there was evidence that the highway was in a dangerous condition due to the instability of the adjacent property exposing those using the highway to a substantial and recurring risk of injury.

The state, however, argues that while it had notice of a number of small slides, it had none of the particular large and unusual slides that occurred on the morning of the accident. A similar contention was rejected in *Smith* v. *County of San Mateo,* 62 Cal.App.2d 122 [144 P.2d 33], where the plaintiff's minor son was killed when one of the large redwood trees fell across the cabin in which the boy was sleeping. In rejecting the county's argument that it had no actual knowledge of the dangerous condition of the particular tree *prior to its fall,* this court said at page 128: "Assuming that knowledge of the dangerous condition of that particular tree was necessary, we believe that there are two sufficient answers to this contention. The first answer is that the evidence showed that at least one employee of the defendant county, namely, Mr. Werder, had observed that this was a spike-topped tree which indicated, according to his testimony, that it was an undernourished, dying and 'dangerous' tree. This evidence was sufficient to show actual knowledge of the dangerous condition on the part of at least one person who admittedly had authority to remedy such condition. The second answer is that the evidence showed that the dangerous condition of that particular tree, which should have been known and seen, had existed for many years and that the officers and employees who had authority to remedy the condition had wholly failed and neglected to do so. This evidence was sufficient to show at least constructive knowledge on the part of all such officers and employees."

The state relies on *Kotronakis* v. *City & County of San Francisco,* 192 Cal.App.2d 624 [13 Cal.Rptr. 709] and *State of California* v. *Superior Court,* 263 Cal.App.2d 396 [69 Cal.Rptr. 683]. In *Kotronakis* and *State of California,* respectively, the presence of random vomit on the street and hot coals on a large beach were held insufficient to make the sidewalk and beach themselves "dangerous" conditions of public property. Both are readily distinguishable as they dealt with unusual transitory situations that originated from different third party sources and not, as here, from the condition of the property itself. The state also relies on *Drummond* v. *City of Redondo Beach,* 255 Cal.App.2d 715 [63 Cal.Rptr. 497], where the site of the accident had been inspected by the city employees just a few

hours before the accident and they found no undue risk of injury to the public. Accordingly, no warning was given to the public. Here, of course, the signs "Slide Ahead" were kept in place after the clean-up the evening before the accident, indicating that the highway employees were apprehensive about the recurring situation.

Nor is the state helped by *Strongman* v. *County of Kern,* 255 Cal.App.2d 308 [62 Cal.Rptr. 908], and *Cheyney* v. *City of Los Angeles,* 119 Cal. App.2d 75 [258 P.2d 1099], where the governmental entities had no notice of the conditions. In the instant case, the recurring slide, the turbulent condition of property on the adjacent hillside, and the mud on the roadway alerted the state to a dangerous condition which it acknowledged by posting the signs to warn the public. *Burnett* v. *City of San Diego,* 127 Cal.App.2d 191 [273 P.2d 345], is likewise distinguishable as there, the leaves and debris on the steps were obvious to any person using them without benefit of a warning sign.

The state's liability here can be predicated on the inadequate warning sign placed in the southbound lane. The uncontroverted evidence indicates that the non-reflective 24-inch sign with 4-inch letters placed in the south bound lane was not "very visible"to passing motorists, did not meet the specifications for a 30-inch by 30-inch reflecting sign with 5-inch letters called for by the state manual, and was placed only 320 feet north of the slide instead of the required 400 feet. Accordingly, here, as in *Bakity* v. *County of Riverside,* 12 Cal.App.3d 24 [90 Cal.Rptr. 541], and *Hilts* v. *County of Solano,* 265 Cal.App.2d 161 [71 Cal.Rptr. 275], the state having undertaken to sign the area was obligated to sign it properly and should have to answer for any inadequate or deceptive warning proximately contributing to the accident. As stated in *Bakity, supra,* at page 31: "Although sections 830.4 and 830.8 of the Government Code, quoted below, provide that a public entity may not be held liable for failure to install traffic signs or signals, when it does so in such a manner as to constitute a trap, liability may be imposed for the maintenance of a dangerous condition. (*Teall* v. *City of Cudahy,* 60 Cal.2d 431, 434 [34 Cal.Rptr. 869, 386 P.2d 493]; *Hilts* v. *County of Solano,* 265 Cal.App.2d 161, 174 [71 Cal.Rptr. 275].) Section 830.8 of the Government Code does not exonerate a public entity for failure to post traffic signs where they are necessary to warn motorists of the existence of a dangerous condition. (*Hilts* v. *County of Solano, supra;* see *Pfeifer* v. *County of San Joaquin,* 67 Cal.2d 177, 184 [60 Cal.Rptr. 493, 430 P.2d 51].)"

We hold, therefore, that under the particular circumstances present here, the repeated and visible slippage in the hillside so that the fence was flat and partly hanging in mid-air, the repeated water and mud on the road that

forced drivers into the lane of oncoming traffic, and the inadequate signing, there was substantial evidence of the existence of a dangerous condition, of which the state had constructive notice, and which it neither remedied nor sufficiently warned against. Accordingly, the state's motions for a non-suit and judgment notwithstanding the verdict were properly denied.

■ The state next argues that the court erred in submitting the question of the decedent's contributory negligence to the jury, as the missing windshield wiper on the passenger side of the car constituted a violation of Vehicle Code sections 26706 and 26707, set forth below.[4] The state cites *Saeter* v. *Harley Davidson Motor Co.,* 186 Cal.App.2d 248 [8 Cal.Rptr. 747], wherein the defective steering device (in violation of the statute governing that equipment) was found to have been the proximate cause of the accident. In the instant case, however, while it was clear that there was no windshield wiper on the passenger side of the decedent's vehicle, from the evidence the jury could readily infer that the windshield wiper on the driver's side was operational and sufficient. There was conflicting evidence as to whether the condition of the tires in any way contributed to the accident. There was no evidence that the decedent had an opportunity to apply his brakes or attempted to do so. There was testimony that the warning sign in the southbound lane could not be read and understood by a driver traveling at 45-55 miles per hour.

A similar argument concerning the predecessor of the Vehicle Code section here involved was rejected in *Wilkerson* v. *Brown,* 84 Cal.App.2d 401 at p. 407 [190 P.2d 958] as follows: "Whether defendant driver did violate any section of the Vehicle Code, in the instant case, was a factual question for the jury. Likewise, if he did violate any such section, then whether such violation was a proximate cause of the accident, and if *there was such a violation* whether it was *excused under the circumstances* were factual questions and not ones of law for this court to determine."

As to the decedent's worn tires and possibility of hydroplaning, there was evidence from which the jury could have concluded he never had sufficient

---

[4]Section 26706: "(a) Every motor vehicle, except motorcycles, equipped with a windshield shall also be equipped with a self-operating windshield wiper. (b) Every new motor vehicle first registered after December 31, 1949, except motorcycles, shall be equipped with two such windshield wipers, one mounted on the right half and one on the left half of the windshield. (c) This section does not apply to snow removal equipment equipped with adequate manually operated windshield wipers nor shall it apply to implements of husbandry."

Section 26707: "Windshield wipers required by this code shall be maintained in good operating condition and shall provide clear vision through the windshield for the driver. Wipers shall be operated under conditions of fog, snow, or rain and shall be capable of effectively clearing the windshield under all ordinary storm or load conditions while the vehicle is in operation."

advance warning of the slide to give him an opportunity to apply his brakes (*Crawford* v. *Southern Pacific Co.*, 3 Cal.2d 427, 429 [45 P.2d 183]) or that the condition of the tires in any way contributed to the accident.

We conclude that the question of the decedent's contributory negligence was properly submitted to the jury and its determination in favor of Briggs sufficiently supported by the evidence.

■ Finally, the state argues that the court committed prejudicial error by giving Instruction No. 9, set forth in full below.[5] The applicable principles were aptly summarized recently in *Bakity* v. *County of Riverside, supra,* at pages 30 and 31, as follows: "Condition of public property may be dangerous where the condition of adjacent property exposes those using public property to a substantial risk of harm. [Citation.] '[A] municipality may be held liable for failure to guard against accidents due to a dangerous or defective condition even though that condition exists off the traveled portion of the highway so long as it is so connected with or in such proximity to the traveled portion of the highway as to render it unsafe to those traveling thereon.' [Citations.]

"The principle announced in those cases is preserved under the Tort Claims Act. In its comment to section 830 the Law Revision Commission states in pertinent part: 'Under the definition as it is used in subsequent sections, a public entity cannot be held liable for dangerous conditions of "adjacent property." A public entity may be liable only for dangerous conditions of its own property. But its own property may be considered dangerous if it creates a substantial risk of injury to adjacent property or to persons on adjacent property; and *its own property may be considered dangerous if a condition on the adjacent property exposes those using the public property to a substantial risk of injury.*' [Italics added.]"

It follows that the instruction given was an accurate and correct statement of the law (*Low* v. *City of Sacramento,* 7 Cal.App.3d 826 [87 Cal.

---

[5]"In respect to a public highway, the dangerous condition referred to in the law just stated does not have to be within the highway itself to impose a duty upon the State of California.

"If a condition exists at such proximity to the highway as to constitute a direct menace to travel within the highway and a danger to persons lawfully using it, even if that condition was not created by the State of California, it is the duty of the State of California, upon receiving notice of the condition, to give reasonably adequate warning of the dangerous condition to persons lawfully using the highway, and to take such protective and remedial measures as may be reasonably practical for the safety of such persons."

Rptr. 173]; *Holmes* v. *City of Oakland,* 260 Cal.App.2d 378, 389 [67 Cal. Rptr. 197]; *Rose* v. *County of Orange,* 94 Cal.App.2d 688 [211 P.2d 45]).

The judgments and orders appealed from are affirmed.

Shoemaker, P. J., and David, J.,* concurred.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.