[Civ. No. 36754. First Dist., Div. Two. Mar. 3, 1976.]

SAM STRAUGHTER, Plaintiff and Respondent, v.
THE STATE OF CALIFORNIA, Defendant and Appellant.

**COUNSEL**

Harry S. Fenton, John P. Horgan, Robert J. DeFea, Harry C. Miller and Donald M. Velasco for Defendant and Appellant.

Newman, Marsh & Furtado and Manuel L. Furtado for Plaintiff and Respondent.

**OPINION**

**TAYLOR, P. J.**—The state appeals from a judgment entered on a jury verdict awarding $35,500 damages for personal injuries to Sam Straughter, who was hit from the rear after he had succeeded in stopping his vehicle on the shoulder of the highway. The major contentions on appeal concern the sufficiency of the evidence to sustain the verdict as to the state's constructive notice of the dangerous condition on the highway. We have concluded that the judgment must be affirmed for the reasons set forth below.

Viewing the record most strongly in favor of the judgment, as we must, the following pertinent facts[1] appear: The collision in which Straughter was injured was one of a series that began about 7 a.m. on December 14, 1972, and lasted for several minutes in the downward sloping eastbound lanes on Interstate 580, on the Altamont Pass above Livermore. Over 30 vehicles were damaged as the drivers confronted reduced visibility after cresting the 1,000 foot summit of the pass, delineated by the North Flynn Road overcrossing. It is not disputed that by the time Straughter approached the accident scene, all four lanes were blocked, and in response to warning lights, he was able to move his vehicle to the slow lane and then onto the shoulder before he was hit in the rear by a truck.[2]

The period of time before and including the date of the accident was one of the two coldest periods in the century in Northern California, and the three-month period ending December 1972 the wettest period of the entire century. Interstate 580 is an eight-lane divided freeway that leaves Livermore and proceeds eastward from the floor of the valley. The temperatures recorded in the Livermore valley were near 20 degrees every night and did not exceed 50 degrees during the day; thus, the thick concrete bed of the roadway had no opportunity to warm up. The state's computerized daily road report listed 580 at the Altamont Pass as "icy" on every day from December 7 to and including December 14. The Livermore valley is 600 feet above sea level, while the roadway at the summit of the pass is 1,150 feet above sea level. Generally, winter temperatures on the pass were colder than those in the valley below; the pass was also known for its windy conditions.

The pertinent portions of the State Highway Maintenance Manual provide as follows: "Ice Control: *Where ice, frost,* or snow-pack *causes slippery pavement,* abrasives and/or chemicals *should be applied. The treatment to be used shall be determined by the immediate supervisor in charge of maintenance of the particular section of the highway.* In areas subject to heavy snowfall, prolonged freezing temperatures, and heavy traffic, abrasives and/or chemicals should be applied to the pavement at the beginning of the snowstorm to prevent a snow-pack from forming and to facilitate snow removal."

---

[1]We have adapted our summary of the facts from the record and Straughter's brief.

[2]Straughter was able to identify the truck that rear-ended his vehicle as one owned by defendant, Silvey Transportation Company and driven by defendant, Thomas A. Leeper. Neither of these defendants is a party to this appeal.

"Patrol: *On routes where freezing conditions are anticipated, special patrols should be scheduled on a continuous basis for the detection and correction of slippery conditions.*"

"Bridges, *Shaded Areas,* and Other Known Isolated Locations of Acute Icing Conditions: *Abrasives and/or chemicals should be applied* at the beginning of a storm or *whenever icing appears imminent.* Bridges which have a tendency to ice, especially when the approaches may be dry, should be given high-priority attention both in patrolling and ice and frost prevention." (Italics supplied.)

About 11 p.m. on December 12, snow began to fall and continued for about one and one-half hours, eventually covering the pavement for about one-half mile on each side of Altamont Pass. Thereafter, the eastbound lanes were sanded to prevent slipperiness. By the early afternoon of the 13th, when Highway Superintendent Smitten and his foreman for the area, McGarvey, inspected the pavement at the summit, both found it "damp"[3] from the preceding night's snowfall. On Smitten's order, McGarvey's crew sprayed urea, an ammonia fertilizer[4] compound, on all four eastbound lanes for three-fourths of a mile east of the summit for several reasons, including: 1) the snowstorm of the preceding night; 2) as a precautionary measure against freezing and fog; 3) for the prevention of ice as the application of urea was to lower the freezing temperature; and 4) the eastbound lanes were "shaded" and did not get any sun until 9 a.m. However, Smitten knew of no written instructions concerning the use of urea and did not know to what temperature it was effective nor how long it would remain so. The effectiveness and duration of urea apparently depends on the solution used and Smitten did not know what McGarvey's crew was using at the time. Smitten denied that any problems could arise from the application of urea to a damp pavement at freezing temperatures, and did not know how long it would remain effective under the traffic volume conditions normally expected on 580 at that time of year. Smitten also was unable to explain why ice had developed by the time of the accident since the urea had been applied the preceding afternoon.

McGarvey, however, believed that urea was to be used only on dry pavement and should not be applied when the temperature was below 32

---

[3]Smitten explained that for him "damp" was analogous to a dishcloth from which no water could be wrung; McGarvey used "damp" to indicate that no tire marks would be left, as distinct from "wet," and his usage of "dry" included a slight dampness.

[4]McGarvey's crew applied the urea at a rate of about eleven one-hundredths of a gallon per square yard.

degrees. He was aware of the fact that if the liquid solution was sprayed when freezing was imminent, the urea solution itself would freeze up and contribute to the slipperiness of the highway. He did not know to what extent the application of the urea solution would lower the freezing temperatures and would expect the application to last four-five days. He had no explanation as to why the application on the afternoon of the 13th did not last or work as expected.

On the afternoon of December 13, an interoffice weather forecast predicting freezing temperatures in the Livermore valley for the following day was received by both McGarvey and Smitten. Smitten testified that the expected fog and cold conditions called for the application of urea to problem areas, which was done, and the monitoring of temperatures during the night, which was admittedly not done. Smitten indicated that he depended on McGarvey, an experienced foreman, to do so.

About 3:10 a.m. on the morning of December 14, two highway patrol officers, Blick and Busby, on routine patrol through the area in question, found it foggy with visibility at 50-75 yards, and the road surface wet.

About 4 a.m. on December 14, McGarvey arose to check the Altamont for icy conditions; at this time, the temperature at his Livermore home was 34 degrees; the Livermore Laboratory showed a reading of 23 degrees at this time; Hill 300, about five miles from the pass, showed temperatures dropping below freezing after 3 a.m., with the humidity saturated after that time. McGarvey did not verify his home thermometer reading by checking any other local readings or monitor the temperatures after his 4 a.m. reading until after the accident. He also erroneously believed that it would be a few degrees warmer on the Altamont than in Livermore. The record contains ample substantial evidence to the contrary. McGarvey, however, knew at 4 a.m. that the temperature would be coldest just before sunrise (7:17 a.m.), and could reasonably be expected to drop "several degrees" after 4 a.m., as well as that the eastbound lanes remained shaded for an hour and a half after sunrise. He also knew that Altamont summit was windier than the valley and that freezing temperatures were predicted.

McGarvey left his home and traveled over the future accident scene about 4:30 a.m., observing low damp fog. He knew that the ground level fog that he observed would dampen the highway and cause moisture to build up that could turn into freezing if the temperature dropped below freezing. At 5:15 a.m., McGarvey telephoned his sanding crew and

ordered them to meet him at N. Flynn overcrossing on the Altamont summit. He then went back over the accident scene at 5:30, again seeing low damp fog, turned around, and met the sanding crew at the N. Flynn Road overcrossing at 6:15 a.m. The sanding crew had been at the summit since 5:45. McGarvey admitted that he "wasn't really checking for ice in those eastbound lanes" on his trips that morning, as his primary concern was the outermost westbound lane which had a seeping problem and the "structures" (overpasses and viaducts) that tend to freeze more rapidly as they get air from all sides and, therefore, freeze more quickly than the roadway. However, after a lunch conference with his attorney, McGarvey testified that during his first inspection trip over the pass at 4:30 a.m., he brake-tested for ice every half or quarter of a mile and that he found the pavement in the eastbound lanes dry and not icy at 4:30 a.m. and 5:30 a.m. He directed the sanding crew to sand the westbound lanes and at about 6 a.m., reported to Smitten that although the weather was foggy, the highway at Altamont was dry and icy and that the icy shoulders were being sanded. After his last inspection trip, McGarvey returned to his office in Livermore and also directed the sanding crew to return to the Livermore yard, about eight miles from the scene of the accident.

Straughter's witness, Stanley Sowa, a retired Air Force major and Livermore resident since 1967, drove over the Altamont at approximately 6:35 or 6:45 in his three-quarter ton Ford camper truck on the morning of the 14th. He recalled that it was cold and foggy and that just before he reached the top of the pass, his truck swerved. Sowa assumed the road was icy and travelled on carefully at a speed of 25-35 miles per hour. He also noticed that the road on the east side of the pass appeared to be icy in spots.

The series of collisions that led to Straughter's injuries apparently began about 7 a.m. when R. Scarborough crested the eastbound lanes of the Altamont Pass in a truck pulling two trailers and encountered increased fog. Scarborough saw brake lights squiggling across the road in front of him and attempted to slow down but was unable to control his vehicle because of the icy conditions. His vehicle came to a rest across three of the four eastbound lanes with the headlights shining in the face of the eastbound traffic. Only the outermost slow eastbound lane was still open a minute or two later when Nighswonger crested the pass. The Nighswonger vehicle also began to slip but was brought under control without impacting anything. Nighswonger observed thin, patchy ice on the pavement and experienced some difficulty with his footing after alighting, as did his passenger Edwards. Immediately behind Nighswong-

er was Hogan, who also experienced slipperiness, and was able to bring his vehicle to a stop without a collision. Hogan got out and observed ice across all four of the eastbound lanes of the highway up to one-fourth inch thick for a distance of about one hundred yards in the area of the accident. Hogan also saw fog turning into ice on his vehicle.

Anders, who followed Hogan, indicated that visibility over the top of the pass "was like running into a blank wall." Anders unsuccessfully attempted to avoid a collision with another truck. When he was assisted in getting out of his vehicle, he also slipped on the very icy road surface.

Straughter, who was behind Anders, experienced a slight weaving of his vehicle before bringing it to a stop. Like his passenger Randolph, he experienced slipping after getting out of the car. Randolph noticed frost on the hillside, as well as some dampness and ice in the eastbound lanes of the highway.

Leeper's truck then went into a slide and crashed into Straughter's parked vehicle. As Leeper left his vehicle, he noticed that the pavement was covered with ice when his feet slipped out from under him as he got out.

Morine, the highway patrol investigating officer, arrived about 7:30 a.m., found nearly 100 cars scattered about and the highway covered with ice. His official report concluded that the accident was due to fog and icy conditions, and used terms such as "slick ice"[5] and "iced roadway." On cross-examination, Morine denied seeing ice on the roadway, but admitted experiencing slipperiness and footing problems.

Straughter called as an expert witness James Sandberg, the chief of meteorology for the Bay Area Pollution Control District, and a specialist in micro-meteorology. Sandberg described the general meteorological pattern in effect on December 14, 1972, as an extreme cold pattern of Arctic air flow which had filled the central valley with "super-cool" fog. Based on area weather records and temperature reports, Sandberg testified that the reasonably expected temperature at the accident scene would be in the low 20's.

Sandberg also indicated, in reply to a hypothetical question incorporating the conditions and facts in evidence, that conditions were adequate for the formation of ice by 3 a.m., and that he would expect the ice to

---

[5]On redirect, Morine indicated he did not know where he got this term.

have accreted gradually due to the meteorological conditions. On cross-examination, Sandberg reiterated the probability of ice formation on the eastern face of the pass beginning shortly after 3 a.m., and also reiterated that the ice formation process and the build-up of the ice would be gradual. During Sandberg's testimony, the state introduced its exhibit "B," an official weather chart from Hill 300, located about five miles from the Altamont Pass, that showed temperatures dropping below freezing after 3 a.m., and the humidity to be saturated after that time. The temperatures shown were 26 degrees at 5 a.m., and 25 degrees from 6 a.m. to 7:30 a.m., when it went up to 28 degrees.

The chief deputy fire warden for Alameda County, Raphael, who was based at Livermore, arrived at 8:10 a.m. and saw very slick ice on the pavement covering all four lanes and extending for one hundred yards. Photographer Schneider arrived between 8:30 and 9 a.m., almost fell on the slippery pavement as he left his auto, and observed a tow truck sliding broadside on the pavement. Forest Ranger Terwilliger arrived about 9 a.m. and measured the temperature at the summit at 22 degrees.

McGarvey arrived at the accident scene about 7:40 a.m., did not slip or slide while walking around, and found the visibility on the east side of the summit better than on the west. To him, the pavement of the roadway appeared dry or slightly damp, but the shoulders and guardrails were frosty. Smitten arrived around 9:15 a.m., did not recall any ice on the paved portion of the road, but saw frost and ice forming on the shoulders, as well as the fence and guardrails above the accident scene. He admitted that after the accident, the conditions deteriorated all day long and the pavement then became slippery.

■ So far as here pertinent, Government Code section 835 provides that ". . . a public entity is liable for . . . a dangerous condition of its property if . . . the dangerous condition created . . .

"(a) A negligent . . . act *or* omission of a public employee, *or*

"(b) *The public entity had . . . constructive notice of the dangerous condition . . . .*" (Italics supplied.) Constructive notice may be found where the dangerous condition would have been discovered by a reasonable inspection (*Stanford* v. *City of Ontario,* 6 Cal.3d 870, 882 [101 Cal.Rptr. 97, 495 P.2d 425]).

■ On appeal, the state concedes the application of the substantial evidence rule[6] but chiefly argues, as it did below, that there was insufficient evidence to support the verdict as to the implied finding of the existence of any ice on the paved portion of the highway for a sufficient period of time so that it could have been discovered by a reasonable inspection and remedied.

The state urges that the testimony of the expert Sandberg as to the probability of ice forming after 3 a.m. under existing weather conditions was totally negated by its witnesses who saw no ice before the accident. This contention ignores the testimony of Straughter's witness Sowa who saw ice in the eastbound lanes before the accident. Necessarily, a case of this kind involves large amounts of conflicting testimony. In a civil suit, all that is required is a reasonable probability to support the finding of the jury (*Spolter* v. *Four-Wheel Brake Serv. Co.,* 99 Cal.App.2d 690, 696 [222 P.2d 307]). The jury here could readily believe the expert's testimony concerning the gradual formation of the ice and its existence prior to the accident, as confirmed by Straughter's witness Sowa.[7] The state's argument ignores the fact that the jury may reject even the testimony of an uncontradicted witness, as long as it does not act arbitrarily and does not believe impossibilities (*Spolter, supra,* 696). The jury also could believe that McGarvey should have discovered the ice by reasonable inspection at 4:30, 5:30 or 6:15 a.m. His initial testimony that he was not looking for ice in the eastbound lanes, as he was primarily concerned with the structures and seepage problem in one of the westbound lanes, was dramatically contradicted by his later testimony, after a luncheon conference with his attorney concerning brake-testing every quarter or half-mile. It is uncontroverted that the state maintenance manual, quoted above, required continuous patrolling and temperature monitoring whenever freezing conditions are anticipated, as was the case here. The manual also required application of abrasives to shaded areas whenever icing appears imminent. Smitten admittedly depended on McGarvey to perform these functions. We think that under the circum-

---

[6]Pursuant to this well known rule, we indulge in all reasonable and legitimate inferences to support the verdict.

[7]The state attempts to argue that since common sense indicates that ice can form in a matter of minutes, Sowa's testimony is not contradicted by those witnesses who saw no ice earlier. However, Sandberg, the expert, indicated that the kind of clear ice shown by the photographs of the accident scene usually build up gradually. Further, the slight conflict that the expert reasonably predicted temperatures in the low 20's, while Hill 300 indicated they were, in fact, 25 degrees, is of no significance as they were still below freezing. As indicated above, the state's maintenance manual required special continuous patrols when "freezing conditions are anticipated" and application of chemicals to shaded areas "when icing appears imminent."

stances of the instant case, the questions of whether there was ice which should have been discovered by reasonable inspection, and whether there was adequate time for preventive measures, were properly left to the jury (*Stanford* v. *City of Ontario,* 6 Cal.3d 870, 883-884 [101 Cal.Rptr. 97, 495 P.2d 425]). The jury could readily conclude that given the facts concerning the fog and temperatures, detailed above, known to McGarvey in the early morning of December 14, McGarvey did not conduct a reasonable inspection under the circumstances, as he failed to continue his patrols and admittedly failed to carefully monitor the temperatures.

Here, as in *Briggs* v. *State of California,* 14 Cal.App.3d 489 [92 Cal.Rptr. 433], the state also attempts to argue that as in *Kotronakis* v. *City & County of San Francisco,* 192 Cal.App.2d 624 [13 Cal.Rptr. 709], and *State of California* v. *Superior Court,* 263 Cal.App.2d 396 [69 Cal.Rptr. 683], the quick formation of ice was merely an unusual random and transitory situation that did not originate from the condition of the property itself. This contention is even more inapposite here than in *Briggs.* The dangers of the Altamont Pass, with its elevation, fog and wind conditions during an unusually cold spell with a forecast of freezing temperatures, were recurrent conditions. The state's own witnesses indicated that the accident area was sanded after the snowstorm of the preceding night in conformance with the manual's requirement that abrasives be applied whenever icing was imminent. Smitten testified that in the past, a potential icy condition on the shoulders would generate a sanding program without evidence of ice on the pavement and that the "icy"[8] road conditions that prevailed from December 7-14 required preventive and precautionary measures. From the testimony of Straughter's expert and Sowa, the jury could readily conclude that the ice on the road could have been disclosed by a quick glance given the continuous inspections required by the manual or at least should have been anticipated under the unusually cold weather conditions of that period and the predicted freezing temperatures that, in fact, occurred. It is uncontroverted that 45 minutes before the accident, McGarvey and the sanding crew were less than a mile from the scene of the accident but had ceased the continuous inspection, temperature monitoring, patrolling and application of abrasives to the shaded eastbound lanes, as required by the manual. We can only conclude that here, as in *Briggs, supra,* the state had constructive notice of a recurring dangerous condition, failed to make the

---

[8]Thus, Smitten's testimony negates the state's argument concerning the inaccurate use of the term "icy" because of the computerized reporting system that did not permit a distinction between ice and frost. In any event, the manual also requires abrasives or chemical treatment when frost causes slippery pavement.

required inspections and, therefore, failed to take the requisite precautionary measures.

Further, as Straughter points out, the lack of precise information concerning the urea spraying under all of the circumstances present also gave rise to reasonable inferences that the state negligently created or exacerbated the recurrent dangerous condition. Further, pursuant to Government Code section 830, subdivision (b), the state also has a duty to warn of a dangerous condition (*Flournoy* v. *State of California,* 275 Cal.App.2d 806 [80 Cal.Rptr. 485], approved in *Cameron* v. *State of California,* 7 Cal.3d 318 [102 Cal.Rptr. 305, 497 P.2d 777]). It is uncontroverted that no warnings were given, although McGarvey had amber lights in his truck for that purpose (cf. *Briggs* v. *California, supra,* 14 Cal.App.3d 489, 497). We can only conclude that since there was ample substantial evidence to support the verdict on the several separate and distinct theories of liability, discussed above, the state's motions for a nonsuit and a judgment notwithstanding the verdict were properly denied.

The judgment is affirmed.

Kane, J., and Rouse, J., concurred.