Filed 1/23/14  Donnelly v. Dept. of Transportation CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| AMBER DONNELLY,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>DEPARTMENT OF TRANSPORTATION,<br><br>      Defendant and Respondent. | A135449<br><br>(San Mateo County<br>Super. Ct. No. CIV 485120) |

## I. INTRODUCTION

At around 10:50 p.m. on the night of October 2, 2007, appellant was seriously injured when the car driven by her companion, Christopher Garcia, crossed the dividing lines on eastbound Highway 92 in San Mateo County and crashed into a westbound pickup truck.  She sued the Department of Transportation (hereafter Caltrans) under Government Code section 835,[1] alleging that the accident site was dangerous for several reasons.  A trial commenced, but after evidence had been submitted by both sides, the trial court granted respondent Caltrans's motion for nonsuit on the ground that appellant had presented no evidence that, as required by section 835, Caltrans had notice of any dangerous condition at that portion of the highway.  We agree with the trial court and hence affirm the judgment.

---

[1] All further undesignated statutory references are to the Government Code.

1

## II. FACTUAL AND PROCEDURAL BACKGROUND

On the afternoon of October 2, 2007, appellant and her friend, Christopher Garcia, both then 20 years old, drove from their homes in San Jose to San Gregorio State Beach, a park located just south of Half Moon Bay in San Mateo County. While there, they made a fire, drank wine, and watched the sunset, after which they fell asleep, not waking up until it was dark. They then started driving home with Garcia as the driver. He later pled no contest to a charge of driving under the influence of alcohol. Also, one headlight on the car being driven by Garcia was covered with a yellow film that "dimmed the lights a little bit." Finally, Garcia was also wearing no shoes while driving.

Shortly before the accident occurred, Garcia was driving uphill on eastbound State Highway 92, before its intersection with State Highway 35 (also known as Skyline Boulevard). His intention was to continue eastward on Highway 92 until it joined with Interstate 280, a north-south highway linking San Francisco, San Mateo and Santa Clara Counties. Shortly before its intersection with Highway 35, Highway 92 has a slight uphill incline and, also, a horizontal curve going to the driver's right. Shortly before the crest of the hill, Highway 92 becomes almost level and then Highway 35 creates a "T" style intersection with it. There is then a fork in the highway, with the right lane connecting south to Highway 35 and the left lane continuing easterly on Highway 92 toward Interstate 280.

Garcia admitted that he did not see any of the signs or arrows alerting drivers regarding that upcoming intersection, signs that were, from the exhibits presented to the court, apparently visible at nighttime and located within a quarter of a mile of that intersection. Those signs advised drivers of their option to continue east on Highway 92 or turn right and head south on Highway 35.[2]

---

[2] At the time of the accident multiple guide signs to advise drivers of the upcoming intersection were present. The first read: "Skyline Blvd. right turn one quarter mile." The second read: "Highway 35 junction." The third read: "San Mateo San Francisco straight. Big Basin to the right and Vista Point to the right." The last sign, closest to the intersection, read: " Highway 92 straight, Highway 35 to the right." Garcia testified that he saw none of these signs.

Garcia also conceded that he did not notice any of the other markers on Highway 92, markers designed to help drivers negotiate the intersection, i.e., a large white arrow, a double yellow line, a raised pavement marker, etc. Indeed, he specifically stated that he did not see the double yellow line in the middle of Highway 92 at that point.

When he reached the crest of the hill on Highway 92 and its intersection with Highway 35, there were no cars in front of them. Garcia testified that he "looked over for a second" at appellant Donnelly and, when he looked back, "I couldn't see the road. I didn't see nothing. I felt like I was going to drive off a mountain, so I jerked my wheel to the left and then came up to a stop, and when we came to a stop we got hit." That hit came from a Ford pickup truck travelling westbound on Highway 92, at about 10:50 p.m. But, apparently, before Garcia swerved into the westbound lane, he had also driven his vehicle into a graveled area off on the right side of the roadway, because he remembered he had "hit some gravel," and the only gravel in the area was in two triangular areas on the south side of the intersection.

Appellant Donnelly testified that she had no recollection of the accident. She was severely injured as a result of the collision, including injuries to her head, brain, ribs, pelvis, right femur, right foot and lung.

After the accident, Garcia exited the car and told people that "this is my fault." He had a "strong" odor of alcohol on his breath and his eyes were "red, watery," and his speech was "slow," per a CHP report. Garcia was then given a series of field sobriety tests, which he failed. His blood alcohol concentration was then measured, by two tests, at .077 and .072 and could well have been as high as .08 at the time of the accident.

Garcia was subsequently arrested and charged with driving under the influence of alcohol and causing injury to another person in violation of Vehicle Code section 23153, subdivision (a), a charge to which he later pleaded no contest.

Appellant filed an action against Caltrans alleging a dangerous condition of public property in violation of section 835. Her complaint alleged that the site of the accident was dangerous for several reasons, e.g., limited sight distance and the visibility of the striping, signs, and the intersection from the crest of the Highway 92 hill, the curvatures

3

in that highway, and inadequate warning signs in the area advising drivers to slow to 35 miles per hour.

A jury trial began on January 9, 2012.[3]  After an opening statement by counsel for appellant, counsel for Caltrans moved for a nonsuit because that statement omitted any mention of how and when Caltrans had any notice of a dangerous condition.  The trial court (the Honorable Leland Davis III) denied that motion on the basis that all appellant's counsel's opening statement needed to include was a mention that there had been such notice.

During the ensuing presentation of appellant's case, her counsel presented one expert witness, George Parker Bell, who testified as to the claim of a dangerous condition on the highway.  His essential conclusions were that the relevant part of Highway 92 was unsafe because of several factors, including curves in the road that have inadequate sight and stopping distances, a horizontal curve that was combined with an uphill grade, insufficient channelization for both the intersection and its dirt and gravel islands, and lack of adequate warning signs.

At the close of appellant's case, Caltrans moved for a nonsuit on two bases: (1) appellant could not establish that the subject location was in a dangerous condition as a matter of law and (2) even if it was, there was no evidence that Caltrans had notice thereof, as required by section 835, subdivision (b).

Although the trial court noted that Caltrans had raised "good points" in its motion, and specifically noted that there had been "no evidence of any notice of any . . . alleged dangerous condition," it concluded that it would have Caltrans present its defense case, and thus give it more time to review all the evidence.

At the close of Caltrans's defense case, the trial court granted its motion for nonsuit.  Because of the testimony of Bell, appellant's expert witness, that the location was "unsafe," the court declined to grant the nonsuit on the basis that the relevant area was not dangerous.  Instead, the court ruled that appellant had not presented any evidence

---

[3] All further dates noted are in 2012.

4

that Caltrans knew or should have known of any allegedly dangerous condition at the relevant location on Highway 92, especially in view of the fact that, as argued by Caltrans to the court, before the accident in question here, over 46 million vehicles had driven through that same area without a similar accident occurring.

On January 31, the court's order granting Caltrans's motion for nonsuit was entered. A judgment in favor of Caltrans was entered on February 27. Appellant filed a timely notice of appeal on May 16.

## III. DISCUSSION

### A. *Our Standard of Review and the Pertinent Statute.*

The parties agree that we review a judgment based on the grant of a motion for a nonsuit de novo, and they are correct. (See *Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC.* (2010) 185 Cal.App.4th 1050, 1060.)

Our Supreme Court has stated the law applicable to a review of such a judgment thusly: "A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. [Citation.] 'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give "to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor." [Citation.] A mere 'scintilla of evidence' does not create a conflict for the jury's resolution; 'there must be substantial evidence to create the necessary conflict.' (7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 410, p. 413.)" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291; see also *Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541-1542.)

The operative statute at issue in this appeal is section 835, which reads:

"Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by

the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

"(a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

"(b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

**B.** *The Dangerous Condition Requirement*

As reflected above, liability under section 835 requires proof of a "dangerous condition." This term is defined in section 830, subdivision (a) which states: " 'Dangerous condition' means a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used."

At trial, appellant attempted to establish that the intersection where she was injured was a dangerous condition through the testimony of her traffic engineer expert, George Parker Bell. On appeal, the parties disagree about whether Bell's testimony was sufficient evidence to warrant a jury determination as to whether a dangerous condition existed. Indeed, Caltrans asks us to affirm the judgment of nonsuit on the basis that appellant "had not presented sufficient evidence to show that the location was dangerous as a matter of law." Under the circumstances, it is not necessary to decide this issue, which was not the basis upon which the nonsuit was granted.[4]

Nevertheless, we summarize Bell's opinion here because it is relevant to the trial court's determination that there was insufficient evidence that Caltrans had notice of an

---

[4] We note for the record that a trial court may direct a judgment in an alleged "dangerous condition" lawsuit brought against a public entity notwithstanding an expert's testimony that there was such a condition. (See *Antenor v. City of Los Angeles* (1985) 174 Cal.App.3d 477, 484 and *McKray v. State of California* (1977) 74 Cal.App.3d 59, 62-63.)

allegedly dangerous condition at the intersection of Highways 92 and 35.  Bell, a New Mexico-based licensed professional engineer, described himself as a "self-employed expert dealing with various fields of engineering involving highway and transportation design maintenance and operational issues regarding highways."  Bell never testified that Highway 92, the road Garcia was driving on all the way, was dangerous; he did, however, testify that he believed its intersection with Highway 35 was "unsafe."

Bell's opinion was based on several factors including (1) the combination of vertical and horizontal curves at the intersection unaccompanied by safe stopping and sight distances; (2) "insufficient channelization at the approach of this intersection on the date of the accident;" (3) improper dirt or gravel areas at the junction of the highways; and (4) inadequate and or improper signage on eastbound Highway 92.[5]

C.    *The Notice Requirement*

Section 835.2 defines actual and constructive notice:

"(a) A public entity had actual notice of a dangerous condition within the meaning of subdivision (b) of Section 835 if it had actual knowledge of the existence of the condition and knew or should have known of its dangerous character.

"(b) A public entity had constructive notice of a dangerous condition within the meaning of subdivision (b) of Section 835 only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character.  On the issue of due care, admissible evidence includes but is not limited to evidence as to:

"(1) Whether the existence of the condition and its dangerous character would have been discovered by an inspection system that was reasonably adequate (considering

---

[5] The evidence introduced by the parties showed that, approaching the T-shaped intersection with Highway 35, eastbound Highway 92 increased its height, i.e., had a vertical curve of 7 percent when it was 300-400 feet west of that intersection, an amount that was reduced to 4.2 percent about 200 feet away, and to 1.3 percent just before the intersection.  Also, at about 300 feet west of the intersection, was a sign advising that Highway 92 continued straight ahead, while Highway 35 required a right turn.

7

the practicability and cost of inspection weighed against the likelihood and magnitude of the potential danger to which failure to inspect would give rise) to inform the public entity whether the property was safe for the use or uses for which the public entity used or intended others to use the public property and for uses that the public entity actually knew others were making of the public property or adjacent property.

"(2) Whether the public entity maintained and operated such an inspection system with due care and did not discover the condition."

The plaintiff has the burden of proving that the defendant public entity had actual or constructive notice of the dangerous condition and, indeed, had such in sufficient time to act to correct it. (*Briggs v. State of California* (1971) 14 Cal.App.3d 489, 494-495.) However, "[c]onstructive notice may be imputed if it can be shown that an obvious danger existed for a sufficient period of time before the accident to have permitted state employees, in the exercise of due care, to discover and remedy the situation." (*Id.* at p. 495; see also *Nishihama v. City and County of San Francisco* (2001) 93 Cal.App.4th 298, 303.)

Here, appellant contends that she produced sufficient evidence to establish Caltrans had actual notice of the allegedly dangerous condition at the site where she was injured. To support this argument, she relies on (1) Bell's testimony, which we have summarized above; and (2) the plans and specifications for the relevant portion of the roadway, which date back to 1934 when the roadway was built (the "As-Built Plans"). According to appellant, the crucial plan document, which was admitted into evidence as Exhibit 20, pertains to an October 1991 modification project that Caltrans performed at the intersection where her accident occurred.

Appellant reasons that the As Built Plans establish that Caltrans has always been aware of the condition of the roadway that it built and maintained, and that Exhibit 20 is substantial evidence that Caltrans also knew the condition at the intersection was dangerous because "[t]his very portion of the roadway was specifically studied for safety improvements" as part of the 1991 project. In other words, appellant contends that evidence that Caltrans designed and implemented the standards for the curves and other

8

characteristics of this portion of the roadway is evidence that it had actual knowledge that the condition was dangerous in the ways outlined by Bell at trial.

Alternatively, appellant contends that essentially this same evidence establishes that Caltrans had constructive notice of the allegedly dangerous condition. She reasons: "The State inspected this specific area of the roadway in 1991 when it reviewed and applied the design standards for the curves in that section of the roadway. If the State had exercised due care at this time and evaluated the design standards for **all of the curves** in the project section, it would have easily seen that the roadway at the curve approaching the intersection failed to meet minimum stopping and decision sight distances, as well as other channelization problems with the roadway that Mr. Bell describes as the bases for his opinion that the roadway is unsafe and dangerous."[6] (Bolding in original.)

The trial court specifically addressed Exhibit 20 in its verbal ruling granting the motion for a nonsuit. It said: "I've reviewed Exhibit 20, and I reviewed several times the discussions with Mr. Bell regarding Exhibit 20. . . . *I could find nothing in Exhibit 20 that referred to, mentioned, acknowledged, or in any other way supported an inference that the State was aware of any alleged dangerous condition at the site of this accident*." (Italics supplied.) We have also reviewed Exhibit 20, and we agree with the trial court that this evidence does not support a finding of actual or constructive notice even when considered in conjunction with Bell's expert opinion.

Exhibit 20 is a 1991 Caltrans "Fact Sheet" for its work that year on Highway 92. It describes the "proposed project" as impacting 1.9 miles of Highway 92 west of "the intersection with Route 35." It then states: "The scope of the project is widening to provide a continuous uphill slow vehicle lane and to upgrade the existing nonstandard lane and shoulder widths." Exhibit 20 contains a section specifically entitled "Safety Improvements," which reads: "Lane widths, presently at 11 feet, will be increased to

---

[6] As noted above, Bell never used the term dangerous to describe the road, but he did use the term "unsafe."

9

standard 12-foot lanes.  Shoulder widths, presently at 4 feet, will be increased to an 8-foot standard shoulder adjacent to the downhill lane."

Exhibit 20 also includes two key sections entitled "Standards for which Exceptions are Requested" and "Reasons for Requesting Exceptions."  In these sections, Caltrans requested—and clearly received—permission to (1) *reduce* the "design speed" on certain portions of the 1.9 mile segment from the standard speed of 40-50 mph to 35 mph, (2) reduce the curvature allowed at a "1400-foot long 'horseshoe' curve" from a 550-foot radius to a 360 foot radius, but also reduce the speed there from the "design speed" of 40 mph to 35 mph, and (3) reduce the horizontal clearance on the affected portions from the standard horizontal clearance of 10 feet on a two-lane highway to "minimum clearances" of four to eight feet.

The document then explains why these exceptions were important to this widening and improving of the Highway 92 project; it says: "The project is located in an environmentally sensitive area in steep mountainous terrain.  To lessen the impact to the environment and enable the project to be delivered within currently programmed STIP funds and schedules, it is proposed to widen the existing alignment. . . . [¶] Providing 40 or 50 MPH standards to the next segment easterly of Route 35 (PM 5.2 to R7.3) requires entirely new alignments to maintain a maximum 7 percent gradient.  [¶] Recent traffic studies show an urgent need to provide uphill slow vehicle lanes in long, steep sustained grades.  To accomplish this needed safety improvement, it is necessary to maintain the existing alignment, provide safety improvements and avoid delays due to the right of way acquisition and impacts on surrounding sensitive areas."

Finally, in another potentially relevant section titled "Accident Data," Exhibit 20 states that, between 1988 and 1991, "there was a total of 58 accidents, of which 20 were injury and 3 were fatality accidents. . . . The majority of accidents were of the 'Rear End' or 'Hit Object' variety."

We conclude that Exhibit 20 and Bell's interpretation of it are insufficient evidence to establish that Caltrans had actual or constructive notice of the dangerous condition alleged by appellant in this case for at least two reasons.

10

First, the safety measures and design standards for the curves in this section of the highway that Caltrans adopted in 1991 had nothing to do with the allegedly dangerous condition that Bell testified about in this case. Rather, as Bell confirmed, the improvements added to Highway 92 in 1991 and described in Exhibit 20 related entirely to the " 'continuous uphill slow vehicle lane' " part of that highway, and not to the crest of the hill, i.e., where Highways 92 and 35 meet. More specifically, as Bell testified, the 1991 improvements were "designed to remedy the hill climbing section" of Highway 92. Put another way, and as Caltrans contends in its brief to us, "the 1991 Project thus involved widening the 'continuous uphill slow vehicle lane and to upgrade the existing non-standard lane and shoulder widths' and did not involve the characteristics of the roadway alleged as dangerous in this case. Nowhere in the document did it discuss visibility or sight distance at the crest of the hill or the approach to the intersection between Highways 92 and 35."

This point is, indeed, substantially confirmed by several of the exhibits introduced into evidence which showed that, 300 feet (i.e., one football field) from the intersection where the crash occurred, there was practically no curvature remaining in Highway 92, and only about a 7 percent upward slope, which reduced to 1.3 percent at the intersection.

Second, as appellant acknowledges, Bell specifically relied on the accident data information set forth in Exhibit 20 to support his opinions in this case. "As a general rule, '[w]here the circumstances are similar, and the happenings are not too remote in time, other accidents may be proved to show a defective or dangerous condition, knowledge or notice thereof, or to establish the cause of an accident. [Citations.]' [Citations.] 'The evidence must relate to accidents which are *similar* and which occur under *substantially the same* circumstances. [Citations.]' [Citation.]" (*Genrich v. State of California* (1988) 202 Cal.App.3d 221, 227-228.)

Here, however, the accidents described in Exhibit 20 occurred more than 16 years before appellant was injured and the majority of them were "of the 'Rear End' or 'Hit Object' variety." More fundamentally than that, they all occurred prior to the 1991 roadway project which widened the uphill portion of the highway below the crest where

11

the accident occurred. Thus, these prior accidents are not similar to the accident at issue in this case, and they do not constitute evidence of actual or constructive notice of the allegedly dangerous condition that appellant claims was the cause of her accident.

On the other hand, appellant erroneously discounts the significance of evidence produced by Caltrans regarding the *absence* of similar accidents at the intersection where appellant was injured. Bell himself conceded at trial that, in the five years prior to the 2007 accident involving Garcia's car, over 46 million vehicles had passed through the segment of Highway 92, 23 million of them going, as Garcia was, in an eastbound direction. None of them were involved in any sort of accident where a driver lost control of his car at or near the intersection of that highway and Highway 35.

This evidence regarding the absence of similar accidents is clearly relevant and it reinforces the trial court's finding that the trial evidence was legally insufficient to support a verdict or judgment against this public entity. (See, e.g., *Sambrano v. City of San Diego* (2001) 94 Cal.App.4th 225, 243 [undisputed evidence that there had not been any reports of similar injuries]; *Clarke v. Michals* (1970) 4 Cal.App.3d 364, 372 [uncontradicted evidence that no prior claim or complaint about allegedly dangerous condition had been received by the defendant city]; see also *Meyer v. City of San Rafael* (1937) 22 Cal.App.2d 46, 49-51.)[7]

As the trial court found, nothing in Exhibit 20 indicates that Caltrans had, or should have had, any notice of any dangerous condition at the intersection where appellant was injured. Nor was any other clearly pertinent evidence of Caltrans's either actual or constructive notice adduced by appellant. Indeed, the evidence pertinent to this issue was that Caltrans had never received a similar complaint about the condition that

---

[7] Indeed, Bell also conceded that this fact was relevant in this case. When asked "[I]sn't the fact that we've had at least . . . 23 million vehicles going through this intersection with no prior accidents an indication that the public in general using this roadway with due care is not having a problem safely negotiating that intersection?," he answered: "Yes."

appellant alleges was dangerous in this case.  Therefore, we reject appellant's claim that she presented sufficient evidence to defeat Caltrans's motion for a nonsuit.

## IV. DISPOSITION

The judgment of the Superior Court is affirmed.

_____
Haerle, J.

We concur:


_____
Kline, P.J.


_____
Richman, J.