[Civ. No. 12565. First Dist., Div. Two. Dec. 28, 1943.]

PETER L. SMITH, Respondent, v. COUNTY OF SAN MATEO, Appellant.

Gilbert D. Ferrell, District Attorney, and George M. Naus for Appellant.

James F. Brennan, Harrison W. Call and Walter McGovern for Respondent.

SPENCE, J.—Plaintiff sued defendants to recover damages for the death of his minor son. The action was later dismissed as to defendants other than the county of San Mateo. The cause was tried by the court sitting without a jury. The trial court made findings upon all issues. The findings were in favor of plaintiff upon practically all issues but the trial court found and concluded that plaintiff's action was barred by the provisions of section 4078 of the political code. Plaintiff appealed from the judgment entered upon those findings of fact and conclusions of law and said judgment was reversed on appeal with directions to enter judgment in favor of plaintiff. (*Smith* v. *County of San Mateo,* 57 Cal.App.2d 820 [135 P.2d 372]). The present appeal is taken by the defendant county from the judgment thereafter entered by the trial court pursuant to said directions.

The main question presented on this appeal is whether the evidence was sufficient to support the findings of fact upon which the liability of the defendant county was based. Plaintiff sought to establish his case through the testimony of employees and former employees of the defendant county and there is practically no conflict in the material portions of that testimony.

Before setting forth the particular findings under attack and the evidence relating to said findings we will refer briefly

to certain facts which are wholly undisputed. Plaintiff had a minor son who was ten years of age. The son was on a trip, arranged by the Young Men's Christian Association, into a public park which was owned and maintained by the defendant county. The park consisted of over three hundred acres and was located in the heavily wooded area in San Mateo County between La Honda and Pescadero. On the night of June 22, 1939, and while the son was sleeping in one of the cabins in a camp ground in said public park, a large redwood tree, without any disclosed external cause, fell across the cabin and caused the son's death.

The findings upon which the liability of the county was based were as follows:

"That at all times herein mentioned the defendant county of San Mateo owned and maintained in said county a public park and camping ground sometimes known as 'Loma Mar'; that said park was maintained by said defendant county for public use and was at all said times under the care and supervision of said defendant county; that on and before June 22, 1939, there were standing in said park numerous trees of a height of thirty feet or more, and that some of said trees were dead and partly rotted and were in constant danger of falling to the ground or of being blown down by ordinary winds prevailing in said park; that by reason of such condition of said trees said park and grounds were then and there in a dangerous and defective condition; that such dangerous and defective condition of said park and grounds had existed for many months prior to June 22, 1939, and that such condition was known to said defendant county and to its board of supervisors and county manager, which said officials, and all of them, had authority to remedy such dangerous and defective condition, for a period of many months prior to said last mentioned date; that notwithstanding such knowledge of such dangerous and defective condition of said grounds and said park, said defendant county negligently failed to remedy or remove such condition; that said defendant county, by and through its said officials, agents and employees was at all times herein mentioned aware of said condition of said trees and knew said trees were dangerous and likely to fall or topple at any time."

Defendant contends that the evidence was insufficient to show "knowledge or notice of the defective or dangerous con-

dition" as required by the public liability statute. (Stats. 1923, p. 675; Deering's Gen. Laws, 1937, Act 5619, sec. 2.) In considering this contention, it is appropriate to set forth a description of the tree in question.

The tree was a large coast redwood tree, being about one hundred twenty-five feet in height and having a diameter at the base of about seven to ten feet. It was a second growth tree similar in most respects to the redwood trees quite generally found in coastal area of California. The tree was admittedly " a dangerous tree" as "all the heart of it had been burned out" at the base and the tree leaned a few feet in the direction in which it fell. Upon examination made after the fall of the tree, it appeared that there were only three "live spots" connecting with the roots at the base of the tree which spots measured approximately as follows: one about five inches by fourteen inches; another about eight inches in diameter; and another about six inches in diameter. As described by one of the witnesses, "The interior of the tree was all burned out and there was just about three live spots of woods on the exterior of the tree." Further details of description will be hereinafter mentioned in discussing the question of knowledge.

On the subject of knowledge, there was a great deal of testimony introduced relating to knowledge of the dangerous condition of the trees generally and other testimony relating to knowledge of the dangerous condition of the particular tree in question. In fact the subject of the dangerous condition of the trees appears to have been the subject of discussion among county officials and employees over a long period of time. Mr. Jensen was employed as superintendent of the park from 1935 to 1941. Mr. Werder was the county forester and firewarden for many years. These men were called by plaintiff and they testified at length. Mr. Jensen rendered his "Superintendent's Report No. 1" to Mr. Kellogg, the county executive, shortly after he assumed his duties as superintendent in 1935. Under the heading "Safety," he said in that report "Under this comes the County's responsibility regarding safety of users of showers and dressing rooms and the three swimming pools in the Park; also the matter of the removal of such trees as are a menace to public safety." Mr. Werder was "put in there to clear the trees" as "there were a lot of dangerous and poor trees in the park." He had previously

started some of this work in 1925 and he had been authorized by the board of supervisors in 1931 to establish a labor camp for this work, which camp had consisted of about fifty men. Mr. Werder testified that nevertheless "any number of trees fell" between 1932 and 1938. When he resumed the work after Mr. Jensen became superintendent in 1935, the two men apparently discussed the condition of the trees very frequently as the work progressed. Mr. Werder also discussed the situation on several occasions with Mr. Kellogg, and on at least one occasion with a majority of the members of the board of supervisors in a meeting in Mr. Kellogg's office. Mr. Werder testified, "I discussed the matter several times because I was criticized for taking out too many trees out of the park. But I deemed they were dangerous and should be removed, due to the fact that it was a public playground." We need recite no further testimony to demonstrate that numerous officials and employees of the defendant county, including the board of supervisors, the county executive, the superintendent of the park and the county forester and fire warden, had actual knowledge of the dangerous condition of the trees generally.

With respect to the condition of the tree which fell, no officer or employee admitted that he had actual knowledge of the dangerous condition prior to the fall. Those who were called as witnesses, however, were asked many questions for the purpose of showing that, prior to the fall, they did have knowledge of the dangerous condition of this particular tree. From their answers, it appears that this tree was a "spike-top" or "spike-topped" tree and had been such for more than forty years. Such a tree was described by Mr. Werder as follows: "A redwood tree which is in perfect condition has a perfect plumb top; a tree that is not in good condition and subject to rot has what we call 'a spike-top.' In other words, you will see a long dead spire sticking up through the top of the tree with dead limbs on it. That is what we call a spike-topped tree." Mr. Werder further testified that from his examination of the tree after it fell, he would say "it was a dangerous tree." He was asked by the court, "The top indicated that to a tree man?" and he replied, "Yes, a spike topped tree is an indication of a poor fed tree and a dying tree, undernourished tree." He stated that he "determined certain trees were dangerous from thirty years experience." He then gave the

following answer to the questions propounded: "Q. How do you determine whether they are dangerous or not? A. Trees that were badly rotted and had very little footing. Q. How did you determine they were badly rotted? A. By digging and making a survey of the tree. A redwood tree that is decayed or spike-topped, what we call a spike-topped tree, is generally a tree that is subject to heart rot or spot rot—And if it is that way on top, there is something contributing to the decay of the tree and you will find it at the base of the tree, due to poor feeder roots." He further testified that on this tree "the limb growth was not very good" and that there "was not good live healthy foliage."

While the witnesses, including Mr. Werder, admitted that they had observed this spike-topped tree many times, it did not appear that any witness had actually examined the base of the tree to determine the condition there. In describing the condition which was found to exist at the base after the fall, the term "goose-pen" tree was used in the questions and answers. There is testimony that this tree was a "goose-pen" tree and there is testimony that it was not. That term is not clearly defined in the testimony but it appears probable that most of the witnesses believed that the term denoted a tree which was hollow at the base and had an opening to the outside through which a goose might enter and take shelter in the hollow. It is clear from the testimony that this tree was hollow at the base but it is not clear that there was any appreciable or plainly visible opening to the outside of the tree. The hollow portion at the base had been caused by rotting and burning but there had been no fire in that area for more than forty years. The testimony showed that the tree "had been badly underburned." This condition of the tree could have been determined merely "by removing a little of the leaf mold that had gathered there" and putting one's hand up into the hollow. While the extent of the live spots could not have been determined while the tree was standing without making some further examination, such examination could have been made merely by "digging down under tree." It does not appear, however, that anyone ever removed any leaf mold or dug down under the tree to examine the condition of the base. Without having made any such examination, the employees of defendant testified that they had not considered that particular tree unsafe or dangerous prior to the fall.

■ Defendant argues that there was no evidence to show that the board of supervisors or any person having authority to remedy the condition had knowledge of the dangerous condition of that particular tree and that therefore the above mentioned findings relating to knowledge find no support in the evidence. Assuming that knowledge of the dangerous condition of that particular tree was necessary, we believe that there are two sufficient answers to this contention. The first answer is that the evidence showed that at least one employee of the defendant county, namely Mr. Werder, had observed that this was a spike-topped tree which indicated, according to his testimony, that it was an undernourished, dying and ''dangerous'' tree. This evidence was sufficient to show actual knowledge of the dangerous condition on the part of at least one person who admittedly had authority to remedy such condition. The second answer is that the evidence showed that the dangerous condition of that particular tree, which should have been known and seen, had existed for many years and that the officers and employees who had authority to remedy the condition had wholly failed and neglected to do so. This evidence was sufficient to show at least constructive knowledge on the part of all such officers and employees. ■ It is well settled that the knowledge specified in the statute may be either actual or constructive. As was said in *Edwards* v. *City of San Diego*, 126 Cal.App. 1 [14 P.2d 119] at page 3, ''The first point raised is that actual knowledge of the condition of the tree was not brought home to the appellant and that constructive notice thereof is not sufficient under the statute. It has now been settled that constructive notice in such case is sufficient and that this may be established by showing long continued neglect of conditions that should have been known and seen. (Citing cases.)''

Defendant cites and relies upon *Dineen* v. *San Francisco*, 38 Cal.App.2d 486 [101 P.2d 736], in support of the claim that the statute did not impose upon defendant a duty of inspection. In view of the conclusions which we have reached we deem it unnecessary to discuss the claim that the statute imposes no general duty of inspection. We are not prepared to say, however, that the observations made by Mr. Werder and others did not place upon them a special duty to inspect the base of the tree in order to determine beyond question whether this leaning, undernourished and dying tree

could be allowed to stand without serious danger to the occupants of the cabins in the near vicinity. Unlike the situation in the cited case, the evidence here showed that plainly visible indications of the dangerous condition of the tree had existed for a long period of time and had been observed by those having authority to remedy the condition; and the evidence further showed that a simple inspection of the base of the tree would have indisputably confirmed those plainly visible indications.

Defendant further contends that the evidence is insufficient "because it shows no more than an injury caused by a natural condition" and "because a natural condition is not a 'defect' within the meaning of the statute." In support of this contention, defendant cites certain authorities dealing with the scope of the common-law liability of private landowners and one authority dealing with the scope of the liability of a city under a Michigan statute. We find none of these cases in point. The title and body of our statute clearly show that the liability imposed thereby was intended to be quite broad in its scope. It imposes liability upon counties for injuries "resulting from the dangerous or defective condition" of certain public places including parks and play grounds "in all cases" where the officers or employees "having authority to remedy such condition, had knowledge or notice of the dangerous or defective condition" and had failed to remedy the condition within a reasonable time after acquiring such knowledge or notice. There is no indication in the statute that it was intended to be limited in the same manner as was the liability of a private landowner at common law and there is every indication to the contrary. The liability imposed is predicated solely upon (1) the existence of a dangerous or defective condition (2) the knowledge, actual or constructive, of the existence of such condition and (3) the failure to remedy such condition within a reasonable time after acquiring such knowledge. While the statute does not evidence an intention on the part of the Legislature to make public corporations liable for all injuries resulting from natural conditions upon the public domain, it seems entirely clear that the Legislature intended to impose liability upon a public corporation which might maintain for an unreasonable time a known dangerous but remediable condition in a park or

playground regardless of whether such dangerous condition was attributable to natural or artificial causes.

The Michigan case upon which defendant relies (*Miller* v. *City of Detroit,* 156 Mich. 630 [121 N.W. 490, 132 Am.St.Rep. 537, 16 Ann.Cas. 832]) involved a statute which was entirely different in substance from the one before us. The title of the act there was ''An act to provide for the recovery of damages for injuries caused or sustained by reason of defective public highways, streets, bridges, sidewalks, cross-walks or culverts.'' Plaintiff in that case was injured by the fall of a dead limb from a tree. The court said on page 492 that the injury was not caused by ''such a defect in the highway as to be within the intention of the legislature in its requirement to maintain and repair streets, bridges, sidewalks, cross-walks and culverts. . . . '' The distinction between the two statutes is clear as the Michigan statute imposed liability solely for injuries caused by defective public works while our statute imposes liability for injuries resulting from either defective or dangerous conditions in either public works or public places. In our opinion, the liability imposed by our statute is not limited to conditions ''artificially made by the hand of man'' as argued by defendant.

The judgment is affirmed.

Nourse, P. J., and Sturtevant, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 24, 1944.