Filed 2/28/23  McDonald v. City of Oakand CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LYNNE McDONALD et al., <br><br>       Plaintiffs and Appellants, <br>v. <br>CITY OF OAKLAND, <br><br>       Defendant and Respondent. | A161001 <br><br> (Alameda County <br> Super. Ct. No. RG18931020) |

Plaintiffs Lynne McDonald and her husband David Barr appeal after judgment was entered in favor of the City of Oakland (the City) in their lawsuit for personal injuries and loss of consortium, after McDonald was catastrophically injured in a bicycle accident on a City road that had developed a large pothole.  They contend the trial court erred in granting summary judgment because the evidence established triable issues of fact as to whether the City was on notice of the dangerous condition that caused the accident (Gov. Code, §§ 835, 835.2).

We agree and reverse the judgment.

## BACKGROUND

### A.

A dangerous condition of public property is that which "creates a substantial (as distinguished from a minor, trivial or insignificant) risk of

1

injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." (Gov. Code, § 830, subd. (a)).

A public entity is liable for a dangerous condition of property "if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either: [¶] (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment *created the dangerous condition*; or [¶] (b) The public entity had *actual or constructive notice of the dangerous condition* under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition." (Gov. Code, § 835, italics added.)

Notice is defined by section 835.2 and can be either actual or constructive. Actual notice means the public entity "had actual knowledge of the existence of the condition and knew or should have known of its dangerous character." (*Id*., subd. (a).) A public entity has constructive notice "only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character." (*Id*., subd. (b).) The statute also specifies factors that bear on the issue of due care.[1] (See *ibid*.)

---

[1] Subdivision (b) states that "On the issue of due care, admissible evidence includes but is not limited to evidence as to:

"(1) Whether the existence of the condition and its dangerous character would have been discovered by an inspection system that was reasonably adequate (considering the practicability and cost of inspection weighed against the likelihood and magnitude of the potential danger to which failure

A public entity may raise as an affirmative defense that it acted reasonably under the circumstances, taking into consideration a balance of fiscal and practical considerations unique to public entities.  (See Gov. Code, § 835.4; *Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1138-1139.) This defense allows the public entity to "absolve itself from liability for creating or failing to remedy a dangerous condition by showing that it would have been too costly and impractical for the public entity to have done anything else."  (Cal. Law Revision Com. com, West's Ann. Gov. Code (2023 ed.) foll. § 835.4.)  The affirmative defense created by section 835.4 is distinct from the reasonableness standard that governs under section 835 and ordinary negligence principles as to whether a public entity wrongfully created a dangerous condition.  (*Metcalf*, at p. 1138.)  The latter standard is commensurate with the duty of care owed by private landowners and "does not depend upon the existence of other, conflicting claims on the defendant's resources or the political barriers to acting in a reasonable manner," whereas the affirmative defense under section 835.4 reflects a legislative judgment that public entities may assert that "because of financial or political constraints, the public entity may not be able to accomplish what reasonably would be expected of a private entity."  (*Metcalf*, at p. 1138.)

---

to inspect would give rise) to inform the public entity whether the property was safe for the use or uses for which the public entity used or intended others to use the public property and for uses that the public entity actually knew others were making of the public property or adjacent property.

"(2) Whether the public entity maintained and operated such an inspection system with due care and did not discover the condition."

**B.**

On May 12, 2018, McDonald and Barr were on a morning bike ride with friends in the hills of Oakland, California, when McDonald suddenly flew off her bike and slammed head-first into the pavement while travelling downhill on Grizzly Peak Boulevard. She lost consciousness, suffered serious head and spinal injuries, and doesn't remember the details of the actual crash. On the stretch of road where this happened, there was a pothole. There were no witnesses who saw McDonald crash. She contends the pothole was about four to six feet long and at least several inches deep, and that she crashed after either hitting it or swerving to avoid it.

This stretch of road was classified by the City of Oakland as a Class III Bike Route which, pursuant to statewide design criteria that were incorporated into the City's Bicycle Master Plan, meant it was subject to a higher standard of maintenance than other streets.

**C.**

McDonald and Barr sued the City for dangerous condition of public property and loss of consortium. They alleged the City "owned, operated, designed, constructed, maintained, inspected, repaired, repaved, and controlled this section of the roadway, including the Pothole, where the Incident occurred, as well as the surrounding area," and "that such control included, among other things, causing the surface of the roadway to be repaired, or resurfaced with asphalt, or maintained in such a way as to cause the Pothole to occur." They further alleged the City was negligent in the maintenance, repair and control "of the relevant section of Grizzly Peak Boulevard at the location of the Pothole, such that the roadway presented a dangerous, defective, and hazardous condition" and that the condition of the

4

incident site and surrounding area "presented a reasonably foreseeable and substantial risk of harm to members of the public."

The City moved for summary judgment on the ground, among others, that there was no triable issue of material fact that it had actual or constructive notice of the roadway's defective condition, and that the affirmative defense of Government Code section 835.4 barred liability as a matter of law.

On the notice issue, the City argued the pothole was an "aberration" and it had "no reason to suspect that a recently repaved street would form a large pothole so quickly." It asserted the pothole had existed for an unknown amount of time, but at most a couple of months. It introduced evidence that this section of roadway had been repaved in late 2013, and that less than four years later, on March 30, 2017, it had received a citizen complaint about a different pothole in the same vicinity and had filled it on May 15, 2017. That repair was made about a year before the bicycle accident, and since then the City had received no complaints of any other potholes or pavement issues. The City also proffered an opinion by the employee who supervises the maintenance of all city streets, Sarah Fine, who said that "for a repaved City street to begin to fail and form potholes within less than five years is highly unusual."

In opposition, plaintiffs argued the City was on notice that the roadway was defective because it knew or should have known when it fixed the first pothole in 2017 that the underlying problem was that the structural foundation of the road (its "base layer," located underneath the asphalt surface) had failed. They argued that when the City repaired the 2017 pothole there would have been a distinctive cracking pattern visible (called "alligator cracking") that was an obvious sign of base failure. But instead of

5

excavating under the asphalt and replacing the failed base layer to fix the structural problem, plaintiffs posited, the City simply patched the pothole with a one-inch overlay of asphalt, which it should have known would result in more potholes eventually forming. In support, they proffered the declaration of a paving expert, Russ Scheibley, and deposition testimony from the City's person most knowledgeable on such subjects, Kenneth Patton, which we will discuss in greater detail below. Both opined that the condition of the roadway near the *second* pothole exhibited signs of base failure because of visible alligator cracking. Scheibley also opined that when the City repaired the first pothole in 2017, "it is a virtual certainty" that "the 'alligatoring' pattern was present, visible and obvious."

In reply, the City acknowledged that the failed base layer "may relate to what caused the pothole to eventually form." But it argued there was no evidence that when city workers repaired the first pothole they should have known the road was failing "several yards away" where the second pothole later emerged. The City asserted that there was no "direct" evidence that any alligator cracking was present at that time and no evidence that there was anything wrong with the pavement underneath what eventually became the second pothole. It also argued that even if there were such evidence, it did not and could not give the City notice of a defective condition—the second pothole—that did not yet exist.

The trial court sustained objections to portions of the declaration of plaintiffs' paving expert Scheibley and granted summary judgment for the City. It ruled that there was no legal authority "for the proposition that a public entity can be liable for failure to predict and prevent dangerous conditions that do not yet exist," there was no competent evidence that any alligator cracking was present when the first pothole was repaired, and that

6

the City's evidence established it had no actual notice of the second pothole and no reason to have discovered it prior to the accident. A judgment was entered in the City's favor, from which plaintiffs timely appealed.

## DISCUSSION

A motion for summary judgment "shall be granted if all the papers submitted below show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c). "[S]ummary judgment shall not be granted by the court based on inferences reasonably deducible from the evidence if contradicted by other inferences or evidence that raise a triable issue as to any material fact." (*Ibid.*)

A defendant moving for summary judgment meets its burden of showing that a cause of action has no merit if the defendant has shown that one or more elements of the cause of action cannot be established or that there is a complete defense to the cause of action. (Code Civ. Proc., § 437c, subd. (p)(1), (2).) "Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto." (*Id.*, § 437c, subd. (p)(2))

We review the court's order granting summary judgment de novo, viewing the evidence in the light most favorable to the losing party. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142.)

After independently reviewing the evidence submitted in support and in opposition to the City's motion (except that which the court excluded), we conclude the trial court erred in granting summary judgment.[2]

---

[2] In their reply brief, plaintiffs discuss portions of the Scheibley declaration that were excluded from evidence and assert that those aspects of

7

# I.

## *Notice of the Dangerous Condition*

Plaintiffs argue the court erred in granting summary judgment on the issue of notice because there are material triable issues of fact as to whether: (a) alligator cracking was present and visible in the surface of the roadway in May 2017 when the City repaired the first pothole, and (b) whether it is more likely than not that the second pothole would not have emerged had the City properly remediated the base failure in May 2017 when it fixed the first pothole.

We address the latter issue first, because it bears on whether plaintiffs have even asserted a viable *legal* theory concerning the existence of a dangerous condition which is a point on which the parties disagree.

### A. Dangerous Condition

The City does not dispute that plaintiffs have presented evidence that both potholes were the result of the same underlying base layer failure. Nor does it dispute for purposes here that the pothole involved in the bicycle crash is a dangerous condition. It asserts, however, that it cannot be held liable for failing to predict and prevent a dangerous condition from arising (*i.e.*, the pothole). It argues that because it did not create the original condition that might have led to the pothole's formation (the base layer), there can be no tort liability because such a principle would "drastically

---

his opinion were not speculative. To the extent they are attempting to challenge the court's evidentiary rulings, the contention has been forfeited because it was not made in the opening brief. (See *Dameron Hospital Assn. v. AAA Northern California, Nevada & Utah Exchange* (2022) 77 Cal.App.5th 971, 997.) We consider only those portions of the Scheibley declaration to which objections were not sustained.

increase the burdens" on municipalities to preemptively act on all preliminary signs of road deterioration, no matter how trivial.

Plaintiffs, principally relying on *Fackrell v. City of San Diego* (1945) 26 Cal.2d 196 (*Fackrell*), argue that the City can be liable for the pothole's emergence because there is a triable issue of fact as to whether it was a "natural and probable consequence" of the failed base layer.

We agree with plaintiffs.

### 1.    Legal Principles

Under the Tort Claims Act, public property is in a dangerous condition "if it 'is physically damaged, deteriorated, or defective in such a way as to foreseeably endanger those using the property itself.' [Citation.] A condition is not dangerous 'if the trial or appellate court, viewing the evidence most favorably to the plaintiff, determines as a matter of law that the risk created by the condition was of such a minor, trivial, or insignificant nature in view of the surrounding circumstances that no reasonable person would conclude that the condition created a substantial risk of injury when such property or adjacent property was used with due care in a manner in which it was reasonably foreseeable that it would be used.' (§ 830.2.)" (*Cordova v. City of Los Angeles* (2015) 61 Cal.4th 1099, 1105.) " '[W]hether a given set of facts and circumstances creates a dangerous condition is usually a question of fact and may only be resolved as a question of law if reasonable minds can come to but one conclusion.' " (*Peterson v. San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 810.)

In *Fackrell*, cited by plaintiffs, our Supreme Court held that public property can be dangerous even if it does not present an "actual and present danger of immediate damage." (*Fackrell, supra,* 26 Cal.2d at p. 206.) The Court explained that if public property is designed to be used under

9

conditions that are "normally to be anticipated" it is dangerous if in a condition that "is, or *naturally will become,* unsafe for such use" under those conditions. (*Id.* at p. 204, italics added.) A condition like that is "inherently" unsafe, even though the conditions that "activate such defect and danger" have not yet occurred. (*Id.* at pp. 204-205.) It rejected the proposition, advanced here by the City, that unless public property "was inherently dangerous from the beginning, [a public entity] cannot be charged with either knowledge or notice of any subsequently developed danger or defect." (*Id.* at p. 204.)

At issue there was a mud sidewalk a city had constructed that collapsed out from underneath a pedestrian. The Court held the city was on notice the sidewalk was an unsafe condition even though erosion had not yet undermined the sidewalk's structural integrity, because it was known that this would inevitably happen once it rained. It rejected the city's argument that liability cannot be imposed for "anticipated" or "potential" future dangers (*Fackrell, supra,* 26 Cal.2d at pp. 203-207) and announced the rule that where public employees "have knowledge of circumstances which reasonably might be expected to result in a dangerous condition as a natural and probable consequence of [their] work, such authorities are put upon inquiry," and they must "make inspections commensurate in scope with the nature and character of their knowledge and the peril which should be avoided." (*Id.* at p. 206.) *Fackrell* also emphasized that each case depends on its own facts, and "[w]hether a given set of circumstances creates a dangerous or defective condition is primarily a question of fact." (*Ibid.*)

The City attempts to distinguish *Fackrell* on the ground that the city in that case performed the actual work that made the sidewalk dangerous whereas here the City did not construct the base layer. But the *Fackrell*

10

court's holding that the condition of the sidewalk was dangerous did not turn on who had designed or built it. The significance of the city's involvement in the construction concerned the issue of notice: by virtue of the city having created the dangerous problem, the city was *presumed* to know of the sidewalk's dangerous character (see *Fackrell*, 26 Cal.2d at pp. 203-206, 207), a holding that the Tort Claims Act subsequently codified. (*Brown v. Poway Unified School Dist.* (1993) 4 Cal.4th 820, 834; Gov. Code, § 835, subd. (a)). However, the sidewalk was dangerous not because the city built it but because of circumstances (e.g., rainfall) that "reasonably might be expected to result in a dangerous condition as a natural and probable consequence" of the sidewalk's physical characteristics. (*Fackrell,* at p. 206.)

Like *Fackrell*, cases *not* involving conditions created by a public entity also reflect that public property can be in a dangerous condition because of *potential*, foreseeable risks posed by continued deterioration. (See, e.g., *Briggs v . State of California* (1971) 14 Cal.App.3d 489, 496 [affirming judgment imposing liability on state for injury caused by large and unusual mudslide on highway, holding highway was in a dangerous condition because of instability of adjacent soils that caused recurrent mudslides]; *Smith v. San Mateo County* (1943) 62 Cal.App.2d 122 (*Smith*) [affirming judgment imposing liability for fatal injuries caused by leaning, undernourished and dying redwood tree in county park that eventually fell], approved by *Hawk v. City of Newport Beach* (1956) 46 Cal.2d 213, 217, and superseded by statute on other grounds as stated in *Meddock v. County of Yolo* (2013) 220 Cal.App.4th 170, 181-182.) "[S]ection 835 specifically provides that when a public entity has actual or constructive notice of a dangerous condition, the entity's liability may be predicated on its failure to take protective measures to safeguard the public from dangers *that may not necessarily be of the*

11

*entity's own creation."* (*Ducey v. Argo Sales Co.* (1979) 25 Cal.3d 707, 716, italics added.)

The City cites no authority holding, or suggesting, that an underlying structural problem in a roadway that is reasonably expected to deteriorate without a proper repair and develop an indisputably dangerous pothole is only a minor or trivial defect, not a dangerous condition like the compromised sidewalk at issue in *Fackrell.* (Gov. Code, § 830, subd. (a).). We thus agree with plaintiffs that, although the City did not "create" the base layer failure, it can be held for the danger that failure posed *if* there is evidence the emergence of a dangerous pothole on a designated Class III Bike Route was a natural and probable consequence *and* the City had actual or constructive knowledge that the base layer was failing.[3] The risk that another pothole would develop under those circumstances must be "substantial" and not merely "minor, trivial or insignificant." (Gov. Code, § 830, subd. (a)). But the City cannot escape liability for a deteriorating roadway merely because it had no notice the roadway had *actually* deteriorated to that point.

### 2. Analysis

Here, plaintiffs presented evidence establishing a triable issue of material fact that this stretch of roadway was a dangerous condition due to a deteriorating base layer.

Both plaintiffs' expert Russ Scheibley and the City's person most knowledgeable (PMK) regarding paving witness Kenneth Patton agreed that the base layer was failing under this portion of the road in the vicinity of the two potholes. The City did not introduce any evidence that a failed base layer

---

[3] The City does not assert that the pothole itself is not a dangerous condition to cyclists.

12

in a roadway will *not* naturally continue to erode and form additional potholes if left unrepaired. Furthermore, Patton testified that when a roadway's base layer has been undermined it needs to be repaired and that as the operations manager, when he sees the alligator pattern, his concern is that the base has been undermined, "and in order to effect a definitive repair, the base has to be addressed." Patton also testified that alligator cracking indicates base failure and can lead to potholes, and that potholes will continue to form until the base layer is repaired properly. Therefore, Patton testified, the City looks for alligator cracking when it inspects its roadways so that it can identify any base failure and effectuate a repair.

Plaintiffs' paving expert Scheibley opined that " 'alligator' cracking is one of the more serious problems that an asphalt surface can develop, especially if it is allowed to go without repair" and that if a base layer failure is not repaired, it "inevitably results in the emergence of adjacent potholes." Further, this was a bicycle route and plaintiffs introduced evidence that, as such, it is subject to more stringent maintenance and safety standards than other city streets, precisely because of the hazards that road defects can pose to bicyclists. We conclude that a reasonable factfinder could find that the existence of a failed base layer on this stretch of Grizzly Peak road is a dangerous condition.

The City also argues there is no evidence that the second pothole would *not* have formed even if it had properly repaired the base layer in 2017. But the City did not move for summary judgment on that basis, which concerns the separate and distinct element of proximate causation. (*Cordova*, *supra*, 61 Cal.4th at p. 1106.) Moreover, even if it had, the City's argument misperceives the burden on a party moving for summary judgment; it was the City's burden to establish that plaintiffs could not prove proximate causation.

13

It was not plaintiffs' burden in opposing summary judgment even to raise a triable issue about causation absent any showing on the issue by the City.

In any event, viewing the evidence in the light most favorable to plaintiffs, on this record, a jury could find it was more likely than not that if the City had properly remediated the base layer failure in 2017, the second pothole would not have formed. Regardless of whether the base layer failure had extended all the way to the second location by then, both plaintiffs' expert Scheibley and the City's PMK Patton asserted that the proper way to remediate base layer failure is to excavate beneath the asphalt, dig out the deteriorated base layer, replace it and compact it. Further, Scheibley opined that repairing a base failure without addressing the roadway's failed base layer "inevitably results in the emergence of adjacent potholes."

A jury could reasonably infer that had a base failure repair been done, the City would have discovered and removed all the base layer that was failing at the time, that if the base layer had failed only below the first pothole then the remediation of that condition would have prevented its further deterioration, and that if the base layer failure had already extended as far as where the second pothole eventually formed then replacing it would have prevented the second pothole from forming.

## B. Notice

This brings us to plaintiffs' argument they established a triable issue of material fact regarding notice of the dangerous condition.

Plaintiffs' briefing on the issue of notice is somewhat unfocused because they do not clearly specify whether they are asserting a theory of actual or constructive notice. They argue the emergence of the first pothole and the alligator cracking that likely was present near it were both "physical manifestations" of the underlying base failure that existed at that time and

14

that City employees "could and should have" discovered the base failure at the time the City fixed the first pothole.

In support, they rely on the opinion of their paving expert Scheibley who stated that it was "highly likely" that there was visible, obvious alligator cracking present when the City repaired the first pothole, because alligatoring precedes the emergence of a pothole when there is base failure, not the other way around. He therefore asserted that the City should have addressed the base failure in May 2017 by using the asphalt patching repair method instead of simply filling the first pothole, which in his view fell below the industry standard of care.

Although plaintiffs do not clearly articulate whether they are relying on a theory of actual or constructive notice, their evidence creates a triable issue of material fact as to both.

Actual notice means the public entity "had actual knowledge of the existence of the condition and knew or should have known of its dangerous character." (§ 835.2, subd. (a).) Actual knowledge of a dangerous condition can be proved by evidence that a public employee has observed visible signs of the underlying structural defect or hazard. (See *Smith, supra*, 62 Cal.App.2d at p. 128 [evidence sufficient to show county had actual knowledge of dangerous tree because employee had observed that it was "spike-topped" which meant it was undernourished and dying]; see also *Briggs v. State of California, supra*, 14 Cal.App.3d at p. 497 [state had notice highway was dangerous even though it had no notice of particular mudslide involved in accident, because it knew of earlier mudslides in same location and was aware of condition of adjacent hillside].) Here, Scheibley's opinions that alligator cracking almost certainly was present in 2017 when the City repaired the first pothole and that alligatoring "is a classic sign" of base layer

15

failure were sufficient to create a triable issue as to whether the City had actual notice that the base layer was failing and another pothole likely would develop.

The City argues Scheibley's opinion that alligator cracking was visibly present in May 2017 is purely conjectural and not entitled to any evidentiary weight, because there is no direct evidence of any alligator cracking at that time. But an expert is not a fact witness. An expert never has direct evidence of a fact that, in her opinion, is true. She forms an opinion based on the objectively provable facts and applies her specialized knowledge and skills about how the world works to reach an expert inference about what must have happened. (See, e.g., *Schreidel v. American Honda Motor Co.* (1995) 34 Cal.App.4th 1242, 1251-1253 [expert opinion about mechanical source of clutch problems in automobile].) In other words, an expert's opinion is just a professionally informed *inference* from circumstantial evidence about what the true historical facts are, even when direct evidence does not exist. Experts do this all the time. (See, e.g., *People v. Eubanks* (2011) 53 Cal.4th 110, 148 [crime scene reconstruction expert testimony not speculative]; *People v. Sundlee* (1977) 70 Cal.App.3d 477, 484-485 [arson expert opinion about cause of fire not speculative or conjectural].) Furthermore, an expert's declaration submitted in opposition to summary judgment need not be as detailed in its reasoned explanation as those submitted in support of summary judgment. (See, e.g., *Jennifer C. v. City of Los Angeles Unified School District* (2008) 168 Cal.App.4th 1320, 1332-1333 [holding that expert's declaration on unsafe school conditions was supported by a reasoned explanation and not "conclusory" because it was based on the expert's experience and the facts of the case].) Here, Scheibley was a qualified expert in the road paving and repair, and he explained a logical reason that was

16

founded *on the evidence* for him to conclude that alligatoring was present in 2017, based upon his experience, his review of photographs of the roadway, and a site visit. No more was needed.

Second, this evidence also established a triable issue of material fact concerning constructive notice, which can be established by proof of visible signs of an underlying deteriorating condition that poses a hazard. (See *Fackrell, supra,* 26 Cal.2d at p. 209 [evidence that sidewalk previously crumbled in vicinity where sidewalk collapsed under plaintiff from erosion held relevant both to prove existence of dangerous condition and constructive notice of same]; *Smith, supra,* 62 Cal.App.2d at pp. 127-128 [county on constructive notice of danger posed by rotting tree because it exhibited visible signs of dying and county had neglected to discover and remedy it by digging down under the tree to examine the condition of its base].)

Here, in addition to the opinions of Scheibley and Patton about the significance of alligatoring as evidence of underlying base failure we have discussed, it is undisputed the first pothole emerged (in March 2017) less than four years after the road had been repaved (in late 2013), and yet the City itself proffered a declaration from the employee who supervises the maintenance of all city streets who said that "for a repaved City street to begin to fail and form potholes within less than five years is highly unusual." Viewing this evidence in the light most favorable to the plaintiffs, such evidence that the City knew the road had developed a premature pothole near where the second pothole would later emerge, combined with evidence there was alligator cracking visibly present at that time, creates a triable issue of fact that the City was on constructive notice the base layer was failing. Indeed, the entire premise of the City's opening memorandum of points and authorities on summary judgment was that it had "no reason to

17

suspect that a recently repaved street would form a large pothole" by mid-2018 when the plaintiff was injured.  Yet there was evidence that it *did* have reason to suspect that.  Another such pothole that apparently resulted from a base failure had already formed.

What constitutes a reasonable time to confer constructive notice is ordinarily a factual question (*Maddern v. City and County of San Francisco* (1946) 74 Cal.App.2d 742, 752), and a reasonable factfinder could conclude the City was aware of these indications that the base layer was failing in 2017, in ample time to take action to repair it before the bicycle accident occurred.

For these reasons, the court erred in concluding plaintiffs could not as a matter of law prove the City was on notice of the dangerous condition that caused the injury.

## II.

### *Government Code Section 835.4 Defense*

The City asserts that even if there are triable issues of fact as to whether it had notice of the dangerous condition, its decision not to repair the base layer in 2017 when it repaired the first pothole was reasonable as a matter of law, and thus it has a complete defense under section 835.4.

That provision absolves a public entity for liability for a dangerous condition of public property if it establishes "the action it took to protect against the risk of injury created by the condition or its failure to take such action was reasonable."  (§ 835.4, subd. (b)).  "The reasonableness of the action or inaction of the public entity shall be determined by taking into consideration the time and opportunity it had to take action and by weighing the probability and gravity of potential injury to persons and property foreseeably exposed to the risk of injury against the practicability and cost of

18

protecting against the risk of such injury." (*Ibid.*) This provision establishes an affirmative defense that a public entity must establish. (*Metcalf v. County of San Joaquin, supra,* 42 Cal.4th 1121, 1138.)

The City asserts that no reasonable factfinder would conclude that it was unreasonable for the City to decide, based on the information it had in 2017, not do a base repair on this stretch of road. It is unnecessary to discuss this contention in depth. Reasonableness under section 835.4 is ordinarily a question of fact (*Ducey v. Argo Sales Co., supra,* 25 Cal.3d at p. 720), the City did not introduce any evidence concerning "the practicability and cost" of performing an asphalt repair on the first pothole to ensure that no further potholes would emerge, and the plaintiffs introduced evidence that such work would cost roughly $5 per square foot of roadway. Reasonable minds could differ as to whether the City's decision not to address the base failure in 2017 was unreasonable, and the issue is properly one for the jury.

## DISPOSITION

The judgment is reversed. Appellants shall recover their costs.

19

_____

STEWART, P. J.

We concur.

_____

RICHMAN, J.

_____

MILLER, J.

*McDonald et al. v. City of Oakland* (A161001)